EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Allied Management Group, Inc.; Rafael Portela Rodríguez<br><br>Recurridos<br><br>v.<br><br>Oriental Bank<br><br>Peticionaria | Certiorari<br><br>2020 TSPR 52<br><br>204 DPR \_\_\_\_\_ |
| --- | --- |

Número del Caso: CC-2016-759

Fecha: 30 de junio de 2020

Tribunal de Apelaciones:

    Región Judicial de San Juan, Panel II

Abogado de la parte peticionaria:

    Lcdo. Julio Nigaglioni Arrache

Abogada de la parte recurrida:

    Lcda. Susana B. Castro Cintrón

Materia: Derecho Procesal Civil: Aplicación de las disposiciones relacionadas a la paralización automática bajo el Código de Quiebras federal, la figura de parte indispensable y el requisito de agotar remedios según la Financial Institutions Reform, Recovery and Enforcement Act of 1989.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| ALLIED MANAGEMENT GROUP, INC.; RAFAEL PORTELA RODRÍGUEZ<br><br>Recurridos<br><br>v.<br><br>ORIENTAL BANK<br><br>Peticionaria | CC-2016-759 |

**El Juez Asociado señor RIVERA GARCÍA emitió la opinión del Tribunal.**

En San Juan, Puerto Rico, a 30 de junio de 2020.

En esta ocasión tenemos ante nuestra consideración tres señalamientos, todos basados en asuntos jurisdiccionales. Específicamente, nos corresponde determinar si en este caso aplican las disposiciones relacionadas a la paralización automática, si falta una parte indispensable en el procedimiento y si era necesario agotar los remedios administrativos provistos en la *Financial Institutions Reform, Recovery and Enforcement Act of 1989* (FIRREA).

A continuación, esbozamos los antecedentes fácticos pertinentes al caso de autos.

I

El 30 de mayo de 2007, R-G Premier Bank of Puerto Rico (R-G) y Allied Financial, Inc. (AFI), suscribieron un

contrato denominado "Mortgage Warehousing Credit Agreement", en virtud del cual R-G extendió a AFI una línea de crédito comercial por la suma principal de $3,300,000. El propósito del referido contrato era proveer a AFI una línea de crédito que le permitiera a su vez realizar préstamos comerciales y residenciales a terceros. R-G se comprometió a otorgarle adelantos a AFI, de tiempo en tiempo, que no excedieran de $3,300,000 en una base rotativa.

Así las cosas, el 26 de junio de 2007, AFI concedió a Villas de Costa Jobos, Inc. (Costa Jobos) un préstamo hipotecario por la suma principal de $1,200,000, mediante un acuerdo denominado "Non-Revolving Credit Facility Agreement". En esa misma fecha, Costa Jobos y AFI suscribieron un "Mortgage Note Pledge Agreement" mediante el cual Costa Jobos entregó en prenda a AFI **dos pagarés** hipotecarios, uno por la suma principal de $800,000 y otro por $400,000, como garantía del repago de las obligaciones contraídas en el contrato de préstamo hipotecario.

En garantía de los referidos pagarés hipotecarios y otros créditos accesorios, Costa Jobos constituyó una hipoteca por $800,000 y otra por $400,000 sobre una propiedad sita en el Barrio Bajuras de Isabela. Las obligaciones contraídas por las partes en el "Mortgage Warehousing Credit Agreement" fueron garantizadas por el Sr. Rafael Portela Rodríguez. Bajo los términos de este contrato, el 3 de agosto de 2007, AFI solicitó a R-G un

adelanto de $1,080,000 mediante el modelo de solicitud estipulado por ambas partes, intitulado "Request for Advance".[1] Como garantía por el adelanto, AFI entregó a R-G los dos pagarés hipotecarios que, a su vez, Costa Jobos le había otorgado en prenda como garantía del préstamo hipotecario.

Posteriormente, Allied Management Group, Inc. (AMGI) adquirió la propiedad hipotecada por Costa Jobos y asumió

---

[1] Según surge de la Resolución dictada por el Tribunal de Primera Instancia el 13 de enero de 2016, la cual adoptó los hechos estipulados por las partes en la *Moción conjunta sobre estipulación de hechos materiales que no están en controversia*, el "Request for Advance" dispone lo siguiente:

> We hereby apply for an advance of $1,080,000.00 to be made under the terms and conditions of our Mortgage Warehousing Credit Agreement with you dated May 30, 2007 ('the Credit Agreement').

> We hereby certify that there exists no default in the observance or performance by us of the Credit Agreement or any other agreement to which you are a party or in which, to our knowledge, you have an interest.

> We enclose the Schedule of Pledge Collateral and the documents to be retained in your files, in pledge, until the Advance represented by each Mortgage is repaid.

> In the case of individual mortgages, we enclosed the documents required by Article 5 of the Credit Agreement, duly executed before a Notary Public.

> These documents are to be held by you as Mortgage Collateral until the corresponding Advance, and all accrued interest thereon, is paid in full, or as otherwise provided on the Credit Agreement.

> We hereby certify that we have applied to corresponding insurance and promise to deliver a certificate of such insurance to you within the time and under the terms specified in the Credit Agreement or repay the funds advance to us hereunder (together with accrued interest thereon). Further, we hereby certify that we have requested form Stewart Title Guaranty Company the issuance of the title policy in your name for each Mortgage. In the event that said policy is not issued within twenty (20) days from the date of the respective Mortgage, we hereby agree to immediately repay to the Bank the amount advanced in connection with such Mortgage (together with accrued and unpaid interest thereon)". Véase Apéndice de la Petición de *certiorari*, págs.746-747.

Asimismo, en lo aquí pertinente, la sección 9.2 del Mortgage Warehousing Credit Agreement dispone que "[t]he Bank shall release the Mortgage Collateral, as the case may be, upon payment of the Loan or a portion thereof in connection with each release, Borrower shall deliver to the Bank a computation showing compliance with the foregoing payment condition". Íd., pág. 129.

las obligaciones de este último respecto al balance adeudado bajo los dos pagarés hipotecarios. Así, el 2 de octubre de 2009, AMGI emitió un cheque a favor de R-G por $1,080,000. El cheque sería acreditado como pago por el préstamo relacionado a la propiedad de Costa Jobos.[2] El 6 de octubre de 2009 fue acreditado el referido pago y, a esa fecha, el estado de cuenta de la línea de crédito de AFI con R-G reflejaba que esta no adeudaba intereses.[3]

El 30 noviembre de 2009, AFI y R-G suscribieron un contrato intitulado "Term Loan Agreement" que modificaba el "Mortgage Warehousing Credit Agreement" suscrito en el 2007 a los fines de convertir la suma adeudada en un contrato a término por dos años, al cabo de los cuales AFI debía saldar la totalidad de las sumas adeudadas. Sin embargo, el 30 de abril de 2010, la Oficina del Comisionado de Instituciones Financieras (OCIF) cerró las operaciones de R-G y el Federal Deposit Insurance Corporation (FDIC) fue nombrado síndico. A su vez, mediante acuerdo entre el FDIC y Scotiabank de Puerto Rico (Scotiabank), este último adquirió varios activos de R-G, incluyendo los dos pagarés que este poseía en garantía por el préstamo concedido a AFI.

Así las cosas, el 4 de noviembre de 2013, AMGI, que había emitido un cheque a favor de R-G por $1,080,000 en

---

[2] Íd., pág. 253. Específicamente, el cheque disponía lo siguiente: "Pay of loan of Isabela Land". Íd.

[3] Íd., pág. 749.

el 2009, requirió a Scotiabank la devolución de los dos pagarés hipotecarios. Junto a su petición, acompañó una carta suscrita por AFI autorizando a Scotiabank a entregarle a AMGI los referidos pagarés. Sin embargo, Scotiabank se negó a devolverlos. Por ello, el 21 de noviembre de 2013, AMGI envió una segunda comunicación a Scotiabank requiriéndole la entrega de los pagarés. No obstante, el 26 de noviembre de 2013 Scotiabank respondió, mediante carta, que no procedía su devolución.

Consecuentemente, el 19 de diciembre de 2013 AMGI presentó una demanda contra Scotiabank ante el Tribunal de Primera Instancia reclamando la devolución de los dos pagarés hipotecarios, que originalmente fueron dados en prenda a  R-G para garantizar un adelanto de $1,080,000, conforme a un contrato suscrito entre AFI y R-G. Además, AMGI exigió $1,200,000 en daños y perjuicios.

El 29 de enero de 2014 las partes solicitaron conjuntamente la paralización de los procedimientos, ya que se encontraban en conversaciones transaccionales. Sin embargo, incapaces de llegar a un acuerdo, Scotiabank contestó la demanda el 24 de junio de 2014 negando las alegaciones y presentando una serie de defensas afirmativas. En esencia, sostuvo que, según el contrato de préstamo intitulado "Term Loan Agreement" suscrito entre AFI y R-G, los pagarés aseguran la totalidad de la facilidad de crédito que R-G otorgó a AFI y no solo el adelanto de los $1,080,000 concedido bajo una línea de

crédito extendida por R-G a AFI en el 2007. A esos fines, adujo que los pagarés constituyen la colateral de Scotiabank, por lo cual se negó a entregarlos.

Posteriormente, el 12 de septiembre de 2014, AMGI presentó una *Moción de sentencia sumaria parcial*. En la misma, instó al tribunal de instancia a dictar sentencia en cuanto a la devolución de los dos pagarés en posesión de Scotiabank, dejando pendiente la acción en daños y perjuicios. El 6 de noviembre de 2014 Scotiabank presentó su *Oposición a solicitud de sentencia sumaria y Moción para que se desestime la demanda por falta de jurisdicción*. En su oposición, Scotiabank arguyó que el Tribunal de Primera Instancia no tenía jurisdicción sobre la materia a tenor con FIRREA. Asimismo, entre otras cosas, adujo que AMGI dio los pagarés en disputa como garantía de deudas presentes y futuras, y que Scotiabank es un tenedor de buena fe. AMGI ripostó con la presentación de una *Réplica a la oposición a solicitud de sentencia sumaria y moción para que se desestime la demanda por falta de jurisdicción* el 5 de diciembre de 2014.

El 9 de diciembre de 2014 Scotiabank solicitó que se paralizaran los procedimientos hasta que se adjudicara una solicitud de consolidación que dicha parte presentó sobre el caso de autos con *Scotiabank de Puerto Rico v. Allied Financial, Inc.*, KCD2013-2856.[4] En su solicitud de

---

[4] En el caso *Scotiabank de Puerto Rico v. Allied Financial, Inc.*, KCD2013-2856, Scotiabank de Puerto Rico (Scotiabank) demandó a Allied Financial, Inc. (AFI) en cobro de dinero y ejecución de hipotecas por

paralización, Scotiabank alegó que en ambos casos se le reclamó la devolución de los pagarés bajo la misma teoría legal. Por su parte, AMGI y el señor Portela Rodríguez se opusieron a esa solicitud por entender que fue incorrecta la representación que se hizo a la otra Sala del foro de instancia al informar que en ambos pleitos se exigió la devolución de los pagarés, por estar el caso en una etapa procesal avanzada, por haber sido solicitada la paralización de los procedimientos justo cuando está próxima a ser resuelta la controversia principal del litigio sobre la entrega de los pagarés retenidos por Scotiabank y por ser perjudicial el retraso de la adjudicación de esta controversia.

Luego de varios incidentes procesales, el 14 de agosto de 2015 las partes presentaron una *Moción conjunta sobre estipulación de hechos materiales que no están en controversia*. Así las cosas, el 13 de enero de 2016 el Tribunal de Primera Instancia dictó una Resolución, mediante la cual declaró no ha lugar la solicitud de sentencia sumaria parcial presentada por AMGI y la moción de desestimación presentada por Scotiabank. Además, decretó la paralización de los procedimientos en el caso, hasta tanto se adjudicaran las controversias en el otro pleito pendiente ante el foro de instancia.

---

los otros préstamos que compró al Federal Deposit Insurance Corporation (FDIC) y que aún estaban pendientes de pago.

Cabe destacar que, en esa misma fecha, AFI presentó una petición de quiebra ante la Corte de Quiebras de Estados Unidos para el Distrito de Puerto Rico, con el propósito de reestructurar el pago de sus deudas bajo el Capítulo 11 del Código de Quiebras Federal. Consecuentemente, los procedimientos en *Scotiabank de Puerto Rico v. Allied Financial, Inc.*, KCD2013-2856 quedaron paralizados.

Inconforme con la determinación del tribunal de instancia, AMGI presentó un recurso de *certiorari* ante el Tribunal de Apelaciones, en el cual, esencialmente, señaló que el foro primario incidió al paralizar los procedimientos en lugar de aplicar el Derecho y resolver los méritos de la moción de sentencia sumaria parcial y al no ordenar a Scotiabank la devolución de los pagarés solicitados por AMGI.

Luego de evaluar los escritos de las partes, el 8 de junio de 2016 el Tribunal de Apelaciones notificó una sentencia sumaria parcial a favor de AMGI y ordenó que le devolvieran los pagarés hipotecarios objeto de la reclamación. Ello, por entender que en este caso no aplicaba FIRREA, y que el incumplimiento alegado no era imputable al banco fallido R-G ni al FDIC como dispone la referida ley. En cuanto a la alegación de falta de parte indispensable de WM Capital Partners 53, LLC (WM Capital), institución a la cual Scotiabank presuntamente le traspasó los pagarés hipotecarios en disputa, resolvió que no eran

indispensables en el pleito, ya que de ser necesario podrían reclamar contra Scotiabank, en un pleito separado, el asunto de los pagarés. Por consiguiente, devolvió el caso al Tribunal de Primera Instancia para que continuara con la acción de daños y perjuicios que quedó pendiente.

Insatisfecho, el 8 de agosto de 2019, Scotiabank presentó un recurso de *certiorari* ante nos, en el cual señaló lo siguiente:

Erró el Tribunal de Apelaciones al asumir jurisdicción y adjudicar la titularidad de los pagarés cuando la jurisdicción sobre esta controversia la tiene la Corte de Quiebras de los Estados Unidos para el Distrito de Puerto Rico.

Erró el Tribunal de Apelaciones al asumir jurisdicción sobre el caso ante la ausencia de una parte indispensable.

Erró el Tribunal de Apelaciones al asumir jurisdicción sobre el caso a pesar de que los recurridos no agotaron los remedios administrativos requeridos por FIRREA.[5]

En esencia, Scotiabank adujo que el foro apelativo intermedio no tenía jurisdicción para adjudicar la titularidad de los pagarés, ya que esa controversia se encontraba ante la consideración de la Corte de Quiebras. Asimismo, indicó que faltaba una parte indispensable, WM Capital, ya que dicha institución es quien posee actualmente los pagarés objeto de este pleito. Finalmente, Scotiabank sostuvo que para que los tribunales estatales tuvieran jurisdicción sobre el caso, AMGI tenía que haber agotado los remedios administrativos requeridos por

---

[5] Petición de *certiorari*, pág. 12.

FIRREA. Ello pues, a su entender, la ley es clara en que se privó de jurisdicción, tanto a los tribunales estatales como a los federales, de atender reclamaciones sobre cualquier acto u omisión de la institución bancaria fallida.

Oportunamente, AMGI presentó su oposición a la petición de *certiorari* mediante la cual alegó que no existe controversia alguna en cuanto a que el presente caso no está paralizado ni se encuentra bajo la jurisdicción del Tribunal de Quiebras, ya que tanto WM Capital como AFI, quienes son las partes de la acción adversativa que se está ventilando ante la Corte de Quiebras, reconocen que el asunto sobre la titularidad de los pagarés está bajo la jurisdicción de los tribunales estatales, y lo que ellos están litigando en el procedimiento adversativo es el derecho de retracto de crédito litigioso que reclama AFI para adquirir los préstamos que compró WM Capital a Scotiabank. En cuanto a la alegación de parte indispensable, AMGI indicó que, independientemente de lo que hizo Scotiabank con los pagarés saldados por AMGI, dicha institución responde por la entrega de estos para su cancelación y, en su defecto, debe compensar a AMGI por el valor de los pagarés. De igual modo, expresó que a este caso no aplican los procedimientos bajo FIRREA, pues R-G (la institución fallida) nunca se negó a entregar los pagarés. Por lo tanto, nunca hubo actos u omisiones de R-

G que requiriesen agotar el procedimiento administrativo que establece FIRREA.

El recurso de *certiorari* se expidió. Estando pendiente el caso para ser resuelto, se presentó una *Solicitud de sustitución de parte demandada*. Desde el 31 de diciembre de 2019, Scotiabank se fusionó con Oriental Bank (Oriental o parte peticionaria), convirtiéndose este último en la entidad bancaria subsistente tras la fusión. Por ello, se solicitó la sustitución de Scotiabank por Oriental como la parte peticionara. A esos efectos, el 14 de febrero de 2020 emitimos una Resolución, mediante la cual ordenamos al Secretario de este Tribunal realizar la sustitución de parte correspondiente y enmendar el epígrafe del caso. Tras examinar los alegatos de ambas partes, procedemos a resolver.

**II**

**A. La jurisdicción de los tribunales**

La jurisdicción es el poder o autoridad de un tribunal para considerar y decidir casos y controversias.[6] Es por eso que, la falta de jurisdicción de un tribunal, incide directamente sobre el poder mismo para adjudicar una controversia.[7] De ese modo, la ausencia de jurisdicción

---

[6] *Peerless Oil v. Hermanos Pérez*, 186 DPR 239, 249 (2012); *S.L.G. Solá-Moreno v. Bengoa Becerra*, 182 DPR 675, 682 (2011). Véanse, además: *González v. Mayagüez Resort & Casino*, 176 DPR 848, 854 (2009); *ASG v. Mun. San Juan*, 168 DPR 337, 343 (2006).

[7] *Peerless Oil v. Hermanos Pérez*, supra, págs. 249-250; *Souffront v. A.A.A.*, 164 DPR 663, 674 (2005).

trae varias consecuencias, tales como el que no sea susceptible de ser subsanada; las partes no puedan conferírsela voluntariamente a un tribunal como tampoco puede este arrogársela; conlleva la nulidad de los dictámenes emitidos; impone a los tribunales el ineludible deber de auscultar su propia jurisdicción; obliga a los tribunales apelativos a examinar la jurisdicción del foro de donde procede el recurso, y puede presentarse en cualquier etapa del procedimiento, a instancia de las partes o por el tribunal *motu proprio*.[8]

En ese sentido, hemos sido enfáticos en que los tribunales deben ser celosos guardianes de su jurisdicción y que no poseen discreción para asumirla donde no la tienen.[9] Por consiguiente, los asuntos relacionados a la jurisdicción de un tribunal son privilegiados y deben atenderse con primacía a cualesquier otros.[10] Esto pues, "[u]na sentencia, dictada sin jurisdicción por un tribunal, es una sentencia nula en derecho y, por lo tanto, inexistente".[11] A causa de ello, "cuando un tribunal determina que no tiene jurisdicción para intervenir en un asunto, procede la inmediata desestimación del recurso

---

[8] *S.L.G. Solá-Moreno v. Bengoa Becerra*, supra; *González v. Mayagüez Resort & Casino*, supra, pág. 855; *Pagán v. Alcalde Mun. de Cataño*, 143 DPR 314, 326 (1997).

[9] *Peerless Oil v. Hermanos Pérez*, supra, pág. 250; *S.L.G. Szendrey-Ramos v. F. Castillo*, 169 DPR 873, 882 (2007).

[10] Íd. Véase, además, *Autoridad sobre Hogares v. Sagastivelza*, 71 DPR 436, 439 (1950).

[11] *Montañez v. Policía de Puerto Rico*, 150 DPR 917, 921 (2000).

apelativo conforme lo ordenado por las leyes y reglamentos para el perfeccionamiento de estos recursos".[12]

Como hemos repetido en múltiples ocasiones, es deber de los foros adjudicativos examinar tanto su propia jurisdicción como la del foro de donde procede el recurso ante su consideración.[13] En vista de eso, este Tribunal tiene la responsabilidad de asegurarse que nuestro foro apelativo intermedio imparta justicia conforme al ámbito de autoridad que se le ha conferido estatutariamente.[14] Por ello, cuando el Tribunal de Apelaciones asuma jurisdicción en un recurso sin tenerla, es nuestro deber así declararlo y desestimar el recurso.[15]

## B. Los efectos de la paralización automática en los pleitos pendientes

Una de las protecciones instituidas en el Código de Quiebras para aquellos que se acogen a este es la paralización automática, puesto que impide, "entre otras cosas, el comienzo o la continuación de cualquier proceso judicial, administrativo o de otra índole que fue o pudo haber sido interpuesto **contra el deudor**, o para ejercitar

---

[12] *Peerless Oil v. Hermanos Pérez*, supra; *S.L.G. Solá-Moreno v. Bengoa Becerra*, supra, pág. 682. Véanse, además: *Souffront v. A.A.A.*, supra; *Carattini v. Collazo Syst. Analysis, Inc.*, 158 DPR 345, 355 (2003).

[13] *Peerless Oil v. Hermanos Pérez*, supra; *S.L.G. Szendrey-Ramos v. F. Castillo*, supra, pág. 883.

[14] Íd.

[15] Íd.

cualquier acción cuyo derecho nació antes de que se iniciara la quiebra". (Énfasis suplido).[16]

Una vez presentada la petición de quiebra, la paralización automática surte efecto, extendiéndose hasta que se dicte la sentencia final.[17] Cabe destacar que esta no requiere notificación formal para ser efectiva.[18] El efecto principal de la paralización automática es que detiene el comienzo o la continuación de cualquier acción judicial o administrativa **contra el deudor,** pendiente o que pudo comenzar antes del inicio de la petición de quiebra.[19] Asimismo, prohíbe las acciones judiciales y administrativas que se inicien **contra el deudor** para recuperar reclamaciones hechas con anterioridad a la petición así como las acciones para cumplir sentencias que se obtuvieron antes de que la petición de quiebra se iniciara.[20]

No obstante, hay que resaltar que, de ordinario, **esta protección es exclusiva del deudor que se acoge a la quiebra,** por lo cual "[l]a responsabilidad de una persona que es codeudor, fiador o en alguna forma garantizador de un quebrado no se altera por la adjudicación en quiebra de

---

[16] *Marrero Rosado v. Marrero Rosado*, 178 DPR 476, 490-491 (2010). Véase, además, 11 USCA sec. 362.

[17] Íd. Véase, además, *In re Jamo*, 283 F.3d 392, 398 (1er Cir. 2002).

[18] Íd.

[19] 11 USC sec. 362(a)(1).

[20] Íd.

éste".[21] Esto tiene el propósito de garantizar el ejercicio de cualquier acción que tenga el acreedor contra cualquier otra persona que se hubiere obligado conjuntamente con el deudor quebrado.[22]

Ahora bien, las Cortes de Quiebras tienen amplia discreción para terminar, anular, modificar o condicionar, a solicitud de parte o *motu proprio*, los efectos de la paralización automática por alguna de las causas enumeradas en el Código de Quiebras.[23] Una de esas circunstancias ocurre cuando una Corte de Quiebras pone fin a la paralización automática para permitir que un litigio continúe en otro foro, especialmente si involucra multiplicidad de partes, si está listo para juicio, o si es lo más prudente en atención al aspecto de economía judicial.[24]

Por otro lado, una Corte de Quiebras puede modificar una paralización automática para permitir que ciertos aspectos de una controversia se diluciden en otro foro, por ser el más apropiado para ello, y, a la vez, retener jurisdicción sobre otros aspectos de la controversia.[25] La

---

[21] *Cámara Insular Etc. v. Anadón*, 83 DPR 374, 380 (1961). Véanse, además: 11 USCA sec. 524(e); 2 Collier on Bankruptcy Sec. 362.03[3][d] (2010).

[22] *Peerless Oil v. Hermanos Pérez*, supra, pág. 256; *Cámara Insular Etc. v. Anadón*, supra, pág. 380.

[23] 11 USCA sec. 362.

[24] *Marrero Rosado v. Marrero Rosado*, supra, pág. 491; Collier, supra, Vol. 3, Sec. 362.07[3][a].

[25] *Marrero Rosado v. Marrero Rosado*, supra, pág. 492. Véase, *John's Insulation v. L. Addison & Assocs.*, 156 F.3d 101, 110 (1er Cir. 1998).

Corte de Quiebras deberá ejercer su discreción de acuerdo con las circunstancias del caso particular.[26]

## C. Ausencia de parte indispensable

La Regla 16.1 de Procedimiento Civil, 32 LPRA Ap. V, dispone que "[l]as personas que tengan un interés común sin cuya presencia no pueda adjudicarse la controversia, se harán partes y se acumularán como demandantes o demandadas, según corresponda". Es decir, sin la presencia de una parte indispensable las cuestiones litigiosas no pueden adjudicarse correctamente, ya que sus derechos quedarían afectados.[27] Esta regla está basada en dos principios fundamentales, estos son: (1) la protección constitucional que impide que una persona sea privada de la libertad y de su propiedad sin un debido proceso de ley, y (2) la necesidad de incluir a una parte indispensable para que el decreto judicial emitido sea completo.[28]

Cabe precisar que el "interés común" al que hace referencia la Regla 16.1 de Procedimiento Civil, *supra*, no es cualquier interés en el pleito, sino que tiene que ser **real e inmediato** y no puede tratarse de meras

---

[26] *Marrero Rosado v. Marrero Rosado*, supra, pág. 491; Collier, supra, Vol. 3, Sec. 362.07[1].

[27] *López García v. López García*, 200 DPR 50, 63 (2018). Véanse: *Deliz et als. v. Igartúa et als.*, 158 DPR 403, 432 (2003); *Cepeda Torres v. García Ortiz*, 132 DPR 698, 704 (1993).

[28] *López García v. López García*, supra, pág. 64; *Cepeda Torres v. García Ortiz*, supra, pág. 704.

especulaciones o de un interés futuro.[29] A esos fines, este Tribunal ha dispuesto que "no se trata de cualquier interés sobre un pleito, sino de un interés de tal orden que impida la confección de un derecho adecuado sin afectar o destruir radicalmente los derechos a esa parte".[30]

Los tribunales deberán evaluar los hechos específicos de cada caso para determinar si debe acumularse a una parte en un pleito o no. A esos efectos, es necesario "hacer un análisis juicioso sobre los derechos de las partes que no están presentes y las consecuencias de que se unan al procedimiento".[31] De ese modo, es primordial precisar si el tribunal puede conceder un remedio final, completo y justo a las partes presentes sin afectar los intereses de la parte ausente.[32]

## D. Remedios Administrativos al amparo de FIRREA

En el 1989, el Congreso de Estados Unidos aprobó FIRREA con el propósito de remediar la inestabilidad de las instituciones depositarias.[33] Como parte de los cambios introducidos por FIRREA, quedó establecida la autoridad de la FDIC para actuar como síndico de instituciones

---

[29] *López García v. López García*, supra; *Pérez Rosa v. Morales Rosado*, 172 DPR 216, 223 (2007); *Deliz et als. v. Igartúa et als.*, supra, pág. 435.

[30] *López García v. López García*, supra; *Romero v. S.L.G. Reyes*, 164 DPR 721, 733 (2005).

[31] *López García v. López García*, supra, pág. 65.

[32] Íd.; *Pérez Rosa v. Morales Rosado*, supra.

[33] Pub. L. No. 101-73, 103 Stat. 183 (codificada según enmendada en 12 USCA sec. 1811, *et seq.*); *Ponce Fed. Bank v. Chubb Life Ins. Co.*, 155 DPR 309, 323-324 (2001).

financieras que hayan fallado.[34] En su función como síndico, la FDIC se entiende sucesor de la institución fallida en todos sus derechos y obligaciones.[35] Así las cosas, la FDIC también puede transferir los derechos de la institución fallida a un tercero.[36]

Como aseguradora, la FDIC tiene el deber de pagar a los depositarios de la institución fallida.[37] Para ello cuenta con dos opciones principales: (1) puede liquidar los activos, o (2) vender los activos a otra institución depositaria.[38] La segunda opción generalmente se manifiesta en un contrato de compra y asunción.[39] Este proceso conlleva que la FDIC venda a otra institución depositaria los activos de la institución fallida, de manera que la

---

[34] 12 USCA sec. 1821(d). Para descripción detallada de la FDIC y su funcionamiento, véase: M.R. Schroeder, *The Law and Regulations of Financial Institutions*, EE UU, Ed. Warren, Gorham & Lamont, 1995, Vol. I, págs. 11.1 – 11.37.

[35] 12 USCA sec. 1821(d)(2)(A). Schroeder, *op. cit.*, págs. 12.14-12.15:

> The FDIC as conservator or receiver succeeds to all the rights, property and privileges of the institution. The officers and directors of the institution, as well as the stockholders of the bank, are precluded from dealing in any way with the institutions assets while the receivership continues. As conservator or receiver, the FDIC operates the insured depository institution with all the powers of the institution and its shareholders, directors, and officers and conducts all business of the institution, collecting all obligations and money due, performing all functions of the institution in the name of the institution and acting to "preserve and conserve the assets and property" of the institution.

[36] 12 USCA sec. 1821(d)(2)(G).

[37] Íd.; Schroeder, *op. cit.*, pág. 12.22, al citar *Gunter v. Hutcheson*, 674 F.2d 862, 865 (11mo Cir. 1982) ("The Federal Deposit Insurance Corporation is a federal agency which insures bank deposits. As insurer one of the primary duties of the FDIC is to pay the depositors of the failed bank").

[38] 12 USCA sec. 1821(a)(1)(A); Schroeder, *op. cit.*, al citar *Gunter v. Hutcheson*, supra.

[39] Véase, Schroeder, *op. cit.*, págs. 12.22-12.27.

reapertura no interrumpa las operaciones bancarias.[40] En este caso, esta adquiere los activos y las responsabilidades de la institución fallida. Así, la solución es beneficiosa para las tres partes involucradas.[41]

La FDIC recibe los activos de la institución fallida, se encarga de sus operaciones y resuelve los reclamos que surjan contra esta.[42] El procedimiento para resolver estos reclamos se recoge en 12 USCA sec. 1821(d).[43] Por otro lado, la FDIC tiene el deber de publicar una notificación para los acreedores de la institución fallida, la cual debe incluir la fecha límite para presentar sus reclamos.[44] Además, la ley establece los periodos y procedimientos que tienen tanto los acreedores para presentar sus reclamos como para la FDIC resolverlos o rechazarlos.[45]

---

[40] Schroeder, *op. cit.*, pág. 12.23, al citar *Gunter v. Hutcheson*, supra.

[41] Íd. ("The FDIC minimizes its loss, the purchasing bank receives a new investment and expansion opportunity at low risk, and the depositors of the failed bank are protected from the vagaries of the closing and liquidating procedure"). Íd., págs. 12.23-12.24, al citar *Gunter v. Hutcheson*, supra, págs. 865-866.

[42] M.A. de Freitas, *Exhaustion of remedies requirement under Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) (12 U.S.C.A. § 1821(d)) with respect to claims against failed financial institution, Federal Deposit Insurance Corporation, or Resolution Trust Corporation*, 122 ALR Fed. 519 sec. 2(a) (1994).

[43] de Freitas, *supra*. Véanse: 12 USCA sec. 1821(d)(3)("Authority of receiver to determine claims"); 12 USCA sec. 1821(d)(4)("Rulemaking authority relating to determination of claims"); 12 USCA sec. 1821(d)(5)("Procedures for determination of claims"); 12 USCA sec. 1821(d)(6)("Provision for agency review or judicial determination of claims"); 12 USCA sec. 1821(d)(7)("Review of claims").

[44] de Freitas, *supra*.

[45] Véase: Schroeder, *op. cit.*, págs. 12.48-12.57.

Uno de los propósitos de la aprobación de FIRREA fue buscar que los asuntos de las instituciones depositarias fallidas se trabajaran de forma expedita.[46] Como parte del marco legal de FIRREA, el Congreso buscó limitar la intervención judicial en los asuntos bajo el poder de la FDIC.[47] En el caso de las funciones de la FDIC como síndico, la ley dispone un límite a la revisión judicial:

(D) Limitation on judicial review
Except as otherwise provided in this subsection, no court shall have jurisdiction over—
(i) any claim or action for payment from, o any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or
(ii)  any claim relating to any act or omission of such institution or the Corporation as receiver.[48]

Esta disposición se ha interpretado como la fuente de la obligatoriedad de agotar los remedios administrativos antes de acudir a los tribunales.[49] En esencia, los Tribunales de Circuito de Apelaciones de Estados Unidos

---

[46] Pub. L. No. 101-73, 103 Stat. 183 (codificada según enmendada en 12 USCA sec. 1811, *et seq.*) ("To provide funds from public and private sources to deal expeditiously with failed depository institutions". Sec. 101).

[47] Véase, 12 USCA sec. 1821(d).

[48] 12 USCA sec. 1821(d)(13)(D). La palabra "Corporation" en este caso se refiere a la FDIC. 12 USCA sec. 1811.

[49] Véanse: *Westberg v. F.D.I.C.*, 741 F.3d 1301 (Cir. DC 2014); *Acosta-Ramírez v.* BPPR, 712 F.3d 14, 19 (1er Cir. 2013) (citando a Marquis *v. F.D.I.C.*, 965 F.2d 1148, 1152 (1er Cir. 1992)); *Benson v. JPMorgan Chase Bank*, 673 F.3d 1207, 1211-1212 (9no Cir. 2012) (citando a *Henderson v. Bank of New England*, 986 F.2d 319, 321 (9no Cir. 1993)); *Village of Oakwood v. State Bank & Trust Co.*, 539 F.3d 373, 385 (6to Cir. 2008) (citando a *Home Capital Collateral, Inc. v. F.D.I.C.,* 96 F.3d 760, 763-764 (5to Cir. 1996)). Véase, también, de Freitas, *supra*. ("It is well accepted, however, that a federal court does not obtain subject matter jurisdiction over a claim until the claimant exhausts the administrative claims procedure under that section").

han resuelto que la interpretación conjunta de las disposiciones de la subsección 1821(d) de FIRREA da a entender que el agotar los remedios administrativos es un requisito jurisdiccional.[50]

A pesar de la amplia aceptación del requisito de agotar remedios administrativos como requisito jurisdiccional al amparo de FIRREA, los tribunales han diferido y atendido controversias de su interpretación en cuanto a su aplicabilidad en distintos contextos. Esto incluye distinciones sobre contra quién o por quién se presentó el reclamo, qué tipo de reclamo era y cuándo surgió el reclamo. Por ejemplo, ha surgido el argumento en cuanto a que el requisito de agotar remedios administrativos no aplica a deudores, solo a acreedores de las instituciones fracasadas.[51] Estos argumentos han sido rechazados por los tribunales de circuito.[52] En *Freeman v. F.D.I.C.*, 56 F.3d 1394, 1400 (Cir. DC 1995), el tribunal rechazó los argumentos de los reclamantes a los efectos de

---

[50] *MTB Enterprises, Inc. v. ADC Venture*, 780 F.3d 1256, 1259 (9no Cir. 2015).

[51] de Freitas, *supra*. ("It may be tempting to argue that the claims-exhaustion requirement of 12 U.S.C.A. § 1821(d) applies only to "creditors" of a financial institution, not "debtors" such as borrowers on loans made by institutions").

[52] Véanse: *McCarthy v. F.D.I.C.*, 348 F.3d 1075, 1079-1080 (9no Cir. 2003) (seguido en *Rundgren v. Washington Mut. Bank,* FA, 760 F.3d 1056, 1061-1062 (9no Cir. 2014)); *Tri-State Hotels, Inc. v. F.D.I.C.*, 79 F.3d 707, 714 (8vo Cir. 1996); *Freeman v. F.D.I.C.*, 56 F.3d 1394, 1400 (Cir. DC 1995); *National Union Fire Ins. Co. v. City Savings,* 28 F.3d 376, 389 (3er Cir. 1994). Existe una excepción reconocida en el caso de las cortes de quiebra. Véase: *Freeman v. F.D.I.C.*, supra, pág. 1401. ("The concern underlying these cases is clear: if bankruptcy courts are ousted of jurisdiction […], the unity of the bankruptcy process may be fractured and some bankruptcy-related claims would be determined […] by FDIC administrative tribunals, which […] have little expertise in bankruptcy matters").

que su estatus de deudor les libraba del requisito de agotar remedios administrativos:

> The Freemans nonetheless contend that § 1821(d) applies only to claims for payment by "creditors" of the failed institution. They insist that as debtors they are not Madison's "creditors" and therefore are not subject to the § 1821(d) jurisdictional bar. This contention, however, does not comport with the statutory language. The statute expressly bars courts from hearing any "claim or action for payment from" *or* "action seeking a determination of rights with respect to" the assets of a failed bank by the FDIC as receiver, unless the administrative claims process is exhausted. (Énfasis en el original y citas omitidas).[53]

El mismo razonamiento se ha seguido posteriormente. En esencia, los tribunales han entendido que el lenguaje del estatuto es sumamente amplio, y no puede entenderse como limitado a los acreedores.[54]

Al citar al Primer Circuito en *Marquis v. F.D.I.C.*, 965 F.2d 1148, 1152 (1er Cir. 1992), la corte de *Freeman v. F.D.I.C.*, supra, definió que "esta barrera jurisdiccional aplica a tres tipos distintivos de reclamos o acciones: (1) todo reclamo que solicite pago de los activos de las instituciones afectadas; (2) toda acción que solicite satisfacción de esos activos; y (3) toda acción para determinar los derechos vis a vis esos activos". (Traducción nuestra) (Cita y comillas

---

[53] *Freeman v. F.D.I.C.*, supra.

[54] *Tri-State Hotels, Inc. v. F.D.I.C.*, supra. ("Rather than mention creditors or limit its application to creditors, § 1821 (d)(13)(D) bars *any* claim or action for payment from, or *any* action seeking a determination of rights with respect to the failed institution's assets unless administrative remedies have been exhausted". (Énfasis en el original y comillas omitidas)).

omitidas).[55] Por lo tanto, cualquier parte que solicite estos remedios con respecto a una institución fallida queda afectada por el requisito.[56]

Por otro lado, hay división entre los circuitos sobre si aplica el requisito jurisdiccional de la misma manera a reclamos que se presentan previo a la entrada del FDIC, y posteriormente.[57] Un sector doctrinario de los circuitos ha determinado que el requisito jurisdiccional aplica igualmente a los reclamos previos y posteriores al nombramiento del síndico ("pre- and post-receivership claims").[58] Sin embargo, incluso entre aquellos circuitos que han decidido que en ambos casos se debe acudir a los remedios administrativos, se ha resuelto que no se trata de una causa para desestimar un caso si estaba pendiente al momento del nombramiento de la FDIC como síndico.[59] Otro

---

[55] *Freeman v. F.D.I.C.*, supra, pág. 1400.

[56] Íd.

[57] Véase: D.M. Roarty, *Resolving Pre-Receivership Claims Against Failed Savings and Loans: An Unnecessarily Exhausting Experience*, 63 Fordham L. Rev. 2315, 2330-2345 (1995). ("Although this Note focuses on those cases involving the RTC as receiver, the conclusions reached are equally applicable to lawsuits involving the FDIC". Íd., págs. 2318-2319).

[58] Véanse: *Intercontinental Travel Marketing, Inc. v. F.D.I.C.*, 45 F.3d 1278, 1282-1284 (9no Cir. 1994); *Brady Development Co., Inc. v. Resolution Trust Corp.*, 14 F.3d 998, 1006 (4to Cir. 1994); *Marquis v. F.D.I.C.*, *supra*, pág. 1151. ("We think that FIRREA makes participation in the administrative claims review process mandatory for all parties asserting claims against failed institutions, regardless of whether lawsuits to enforce those claims were initiated prior to the appointment of a receiver").

[59] Véanse: *Intercontinental Travel Marketing, Inc. v. F.D.I.C.*, supra, pág. 1284. ("We agree that a stay may be appropriate where the district court examines jurisdiction when the claimant still has time to file an administrative claim with the FDIC *before* the administrative bar date passes".); *Brady Development Co., Inc. v. Resolution Trust Corp.*, supra. ("Pending actions must be stayed until the outcome of the administrative process".); *Marquis v. F.D.I.C.*, supra, pág. 1154. ("[Read] as constructing a scheme under which courts

sector doctrinario entiende que FIRREA no veda de ninguna manera que los tribunales atiendan los casos pendientes.[60]

En el presente caso nos interesa conocer cómo los circuitos han interpretado las disposiciones de la sec. 1821(d)(13)(D) cuando se trata de un banco que ha adquirido los activos de la institución fallida del FDIC.

Primeramente, debe observarse que el estatuto tiene un lenguaje claro. Como mencionamos, la disposición abarca todo reclamo o acción que se relacione con los activos de la institución fallida o con los actos u omisiones de esta o de la FDIC como síndico.[61] El inciso (i) limita las acciones que soliciten pago o determinación de derechos sobre activos de la institución fallida.[62] Por otro lado, el inciso (ii) limita las acciones que surjan por un acto u omisión de la institución fallida y la FDIC.[63] Se trata de un criterio funcional, no de forma.[64] No surge

---

[60] Véase: *Whatley v. Resolution Trust Corp.*, 32 F.3d 905, 907-909 (5to Cir. 1994):

Congress created a separate scheme for the handling of pre-receivership actions, giving the receiver the privilege, but not the duty to request a stay of judicial proceedings so that it might first consider the pending claim administratively. Neither a request for a stay nor the failure to request a stay deprives the district court of jurisdiction. Rather, if the receiver requests a stay, the court will defer action temporarily.

[61] 12 USCA sec. 1821(d)(13)(D).

[62] Íd.

[63] Íd.

[64] *Rundgren v. Washington Mut. Bank,* supra, pág. 1064. ("Where a claim is functionally, albeit not formally, against a depository institution for which the FDIC is receiver, it is a 'claim' within

clasificación alguna que limite la figura del demandado, solo la causa que da lugar a la acción. Así también han resuelto varios circuitos federales.

En *Benson v. JP Morgan Chase Bank*, 673 F.3d 1207 (9no Cir. 2012), el Noveno Circuito atendió un caso en el cual un grupo de inversionistas demandó al banco, JP Morgan Chase Bank (JP Morgan), como sucesor de Washington Mutual (WaMu), por una estafa.[65] Los inversionistas argumentaron que JP Morgan, al adquirir los activos y los pasivos de WaMu conforme a FIRREA, era responsable tanto como sucesor de WaMu como por haber continuado las prácticas problemáticas de esta posterior a su asunción.[66] La corte de distrito desestimó la demanda por falta de jurisdicción, porque los inversionistas no habían agotado los remedios administrativos provistos en FIRREA.[67] El Noveno Circuito separó este asunto en dos controversias: (1) si FIRREA extiende a JP Morgan la defensa de remedios administrativos por la conducta de WaMu, y (2) si FIRREA extiende a JP Morgan la defensa de remedios administrativos por la conducta propia.[68] Así las cosas, resolvió en la afirmativa la primera, y en la negativa la segunda.[69] El Noveno

---

the meaning of FIRREA's administrative claims process"). (Énfasis suprimido y citas omitidas).

[65] Específicamente demandan por un llamado "Ponzi scheme". *Benson v. JP Morgan Chase Bank*, supra, pág. 1209.

[66] Íd.

[67] Íd.

[68] Íd.

[69] Íd. Particularmente, se dispuso lo siguiente:

Circuito entendió que el lenguaje inequívoco de FIRREA distingue entre la base fáctica de los reclamos, independientemente de la identidad de la institución.[70] Entiéndase, que lo importante no es contra quién se ejerce la acción (sea el banco fallido, la FDIC o el banco que adquiere los activos) sino los hechos que dan lugar al reclamo.[71] Esto, dado a que la limitación jurisdiccional aplica a cualquier reclamo relacionado a un acto u omisión de la institución fallida o el FDIC como síndico.[72] No obstante, por esta misma razón, resolvió el Noveno Circuito que no se extendía el requisito a acciones que se basaran en actos u omisiones cometidas por el banco que adquiere los activos de la institución fallida.[73] El razonamiento de este tribunal se siguió igualmente en otros circuitos.[74]

---

We reject plaintiff's first contention. Litigants cannot avoid FIRREA's administrative requirements through strategic pleading. Accordingly, we join three other circuits in concluding that **a claim asserted against a purchasing bank based on the conduct of the failed bank** must be exhausted under FIRREA. The same is not true, however, with respect to claims based on **purchasing bank's post-purchase actions**. Such claims are not governed by FIRREA. They could not, and accordingly need not, be exhausted before the FDIC. (Citas omitidas y énfasis suplido).

[70] *Benson v. JP Morgan Chase Bank*, supra, pág. 1212.

[71] Íd.

[72] 12 USCA sec. 1821(d)(13)(D); *Benson v. JP Morgan Chase Bank*, supra.

[73] *Benson v. JP Morgan Chase Bank*, supra, pág. 1215.

[74] *Willner v. Dimon,* 849 F.3d 93 (4to Cir. 2017); *Tellado v. IndyMac Mortg. Services,* 707 F.3d 275 (3er Cir. 2013); *Farnik v. F.D.I.C.,* 707 F.3d 717 (7mo Cir. 2013) ("Recognizing that strategic case captioning would allow creditors to completely bypass FIRREA's administrative process, we join our sister circuits and hold that the FIRREA administrative exhaustion requirement is based not on the entity named as defendant but on the actor responsible for the alleged wrongdoing". Íd., pág. 723); Acosta-*Ramírez v. BPPR*, supra. ("Looking to the substance rather than the form, the plaintiffs' claims are indeed claims against the receivership. […] The plaintiffs may not avoid that reality through strategic pleading. Their claims are

En una decisión anterior, el Circuito del Distrito de Columbia (Circuito de DC) resolvió de manera similar y con sujetos semejantes. En *American Nat. Ins. Co. v. F.D.I.C.*, 642 F.3d 1137 (Cir. DC 2011), un grupo de bonistas de una institución depositaria demandaron en daños y perjuicios. Los bonistas alegaron que JP Morgan, a través de actos impropios, ejerció presión sobre el gobierno federal para que adquirieran a WaMu y se lo vendieran.[75] El tribunal de distrito desestimó la demanda porque los bonistas no habían agotado los remedios administrativos de FIRREA.[76] En apelación, el Circuito de DC hace una distinción importante entre lo que es un reclamo al amparo de FIRREA y la situación de los bonistas.[77] Específicamente, dispuso lo siguiente:

> First, subsection (ii) of § 1824(d)(13)(D) bars only *claims* that relate to an act or omission of the failed bank of the FDIC-as-receiver, and appellants' suit is simply not a "claim" under FIRREA. In FIRREA, the word "claim" is a term-of-art that refers only to claims that are resolvable through the FIRREA administrative process, and the only claims that are resolvable through the administrative process are claims against the depository institution for which the FDIC is receiver. Because appellants' suit is against a third-party bank for its own wrongdoing, not against the depository institution for which the FDIC is receiver, their suit is not a claim within the meaning of the Act and this is not barred by subsection (ii). (Paréntesis suprimido).

---

jurisdictionally barred". Íd., pág. 21); *Village of Oakwood v. State Bank & Trust Co.*, supra, págs. 384-386.

[75] *American Nat. Ins. Co. v. F.D.I.C.*, 642 F.3d 1137, 1139 (Cir. D.C. 2011). La demanda se instó en el tribunal estatal, pero se removió con la intervención de la FDIC.

[76] Íd.

[77] Íd., pág. 1142.

Second, although subsection (i) of § 1824(d)(13)(D) reaches more broadly than (ii), encompassing not just "claims" but also "action[s] for payment from, or […] seeking a determination of rights with respect to, the assets of any depositary institution for which the [FDIC] has been appointed receiver," its plain language excludes the suit brought by appellants. Appellants' suit seeks relief from JPMC for its own conduct; the mere fact that JPMC now owns assets that Washington Mutual once owned does not render this suit one against or seeking a determination of rights with respect to those assets. (Cita omitida y corchetes en el original).[78]

De lo anterior entendemos que la distinción es una fáctica. En este caso, a pesar de la similitud formal, funcionalmente se distingue de la situación que aparece posteriormente en el Noveno Circuito, pues, realmente se trató de una acción torticera de la institución depositaria que adquiere los activos por FIRREA. Por esa razón, revocó la determinación de falta de jurisdicción.[79]

## E. El contrato de prenda

La prenda se define como "el derecho real constituido en garantía del cumplimiento de [una obligación], mediante el cual el acreedor, luego de obtener la posesión material de un bien mueble […], queda facultado para venderlo, en caso de incumplimiento".[80] Un contrato de prenda debe cumplir con los siguientes requisitos esenciales:

(1) Que se constituya para asegurar el cumplimiento de una obligación principal.
(2) Que la cosa pignorada […] pertenezca en propiedad al que la empeña o hipoteca.

---

[78] Íd.

[79] Íd., pág. 1145.

[80] J. R. Vélez Torres, *Curso de Derecho Civil*, San Juan, Centro Gráfico del Caribe Inc., 1995, T. II, pág. 480.

(3) Que las personas que constituyan la prenda […] tengan la libre disposición de sus bienes o en caso de no tenerla, se hallen legalmente autorizadas al efecto.[81]

Adicionalmente, la cosa en que consiste la prenda debe ser susceptible a enajenación, una vez venza la obligación principal.[82] Por último, la prenda requiere que se ponga la cosa en posesión del acreedor para que se constituya el contrato.[83] El deudor no puede solicitar la restitución de la cosa mientras no pague la deuda y sus intereses.[84] Por otro lado, no es oponible a tercero a menos que "conste la certeza de la fecha por documento auténtico".[85]

Mientras dura el derecho de prenda, el acreedor tiene derecho de retención sobre la cosa.[86] Tan pronto se extinga el derecho de prenda, el acreedor debe devolver la cosa pignorada.[87] Sin embargo, si el deudor contrajera otra deuda con el acreedor mientras dura el derecho de retención, el

---

[81] Art. 1756 del Código Civil, 31 LPRA sec. 5001.

[82] Art. 1757 del Código Civil, 31 LPRA sec. 5002.

[83] Art. 1762 del Código Civil, 31 LPRA sec. 5021.

[84] Art. 1770 del Código Civil, 31 LPRA sec. 5029.

[85] Art. 1764 del Código Civil, 31 LPRA sec. 5023. Véase, también, *Liechty v. Descartes Saurí*, 109 DPR 496, 503 (1980):

La prenda, como se sabe, no es un contrato de constitución formal. Para su existencia basta que se haya concertado de cualquier manera lícita y que cumpla con los requisitos intrínsecos que el Código exige (Art. 1762); puede constituirse hasta verbalmente, y obligará a las partes. Lo que ocurre es que para que pueda oponerse con éxito frente a terceros la certeza de su fecha deberá constar por documento auténtico. Este pequeño requisito de formalidad, para que pueda operar contra terceros, se basa en el propósito de evitar la simulación de créditos pignoraticios por un deudor en perjuicio y fraude de terceros acreedores suyos.

[86] Art. 1765 del Código Civil, 31 LPRA sec. 5024.

[87] J. R. Vélez Torres, *op. cit.*, pág. 483.

acreedor podrá prorrogar la retención hasta que se satisfagan ambos créditos.[88] "Ahora bien, durante la vigencia del contrato de prenda, no puede el acreedor disponer de la cosa".[89] Esto, pues el acreedor tiene la obligación de restituirla una vez quede satisfecha la obligación principal.[90]

Cabe destacar que el propósito de las restricciones al uso y el destino del bien prendario es conservar la integridad del bien pignorado pues, una vez quede satisfecho el crédito, la cosa dada en prenda revertirá a quien la constituyó.[91] Así, la restitución es la última obligación del acreedor prendario.[92] Como hemos expresado, la restitución no es otra cosa que *la devolución del bien dado en prenda a quien la constituyó en garantía del pago de una deuda.* (Énfasis en el original).[93]

La obligación del acreedor a restituir la cosa surge inmediatamente cuando se paga la deuda.[94] Si este pago se efectuara por un tercero, en determinadas circunstancias, se puede dar el efecto de subrogación.[95] En este caso, la obligación no se extingue y las garantías permanecen

---

[88] Íd.

[89] Íd.

[90] *Eastern Sands, Inc. v. Roig Comm. Bank*, 140 DPR 703, 711 (1996).

[91] Íd.

[92] Íd.

[93] Íd.

[94] Íd., págs. 711-712.

[95] Íd., pág. 713.

vivas.[96] Este derecho es susceptible a renuncia, siempre que esta "sea clara, terminante, explícita e inequívoca".[97] En *Eastern Sands, Inc. v. Roig Comm. Bank*, 140 DPR 703 (1996), este Tribunal resolvió una controversia similar a los hechos del caso de autos.

En esencia, Eastern Sands, Inc. (Eastern) garantizó con prenda un préstamo concedido por Roig Commercial Bank (Roig). En lo pertinente, el presidente de Eastern, el Sr. Francisco Rincón, en su carácter personal, saldó la deuda de Eastern con Roig y solicitó la devolución de la cosa dada en prenda. Discutimos en ese caso que, si Eastern hubiera pagado la obligación por sí misma, correspondería que se le devolviera la cosa inmediatamente. Sin embargo, no fue Eastern quien pagó. Al haber pagado el señor Rincón, un tercero con interés en el cumplimiento de la obligación, este se subrogó en la posición de acreedor y le correspondía la posesión de la cosa dada en prenda, como accesorio del crédito adquirido.[98] Entre otras cosas, resolvimos que la enajenación del "pagaré dado en prenda a Roig constituye una violación del deber de custodia y cuidado de *pater familiae* que impone la ley y viola el deber de restitución que tenía Roig como acreedor pignoraticio".[99] También enunciamos que "la demora del

---

[96] Íd.

[97] Íd., págs. 719-720.

[98] Íd., pág. 717.

[99] Íd., pág. 723.

señor Rincón en requerir del ROIG la entrega de la prenda" no constituía renuncia de su derecho.[100] "Un retraso en el ejercicio de un derecho no da base para presumir la intención inequívoca de renunciarlo, máxime cuando se trata de una acción sin término prescriptivo fijo, que queda sujeta al plazo de quince años".[101]

### III

En este caso, la parte peticionaria hizo tres señalamientos de error, todos basados en cuestiones jurisdiccionales. La primera alegación es sobre la aplicabilidad de la paralización automática, la segunda trata la alegada falta de parte indispensable y la tercera versa sobre la necesidad de agotar los remedios administrativos provistos en FIRREA. Veamos cada uno de ellos por separado.

En su primer señalamiento de error, la parte peticionaria sostiene que la paralización automática del procedimiento de quiebra, al cual se sometió AFI, abarcaba toda la controversia en torno a los pagarés por formar parte del caudal de AFI.[102] Cabe destacar que, en la sentencia recurrida, esta controversia solo se menciona en forma de un escolio que lee:

El 28 de enero de 2016 el Tribunal de Primera Instancia decretó el archivo administrativo del caso debido a que Allied Financial, Inc., se acogió a los beneficios

---

[100] Íd., pág. 720.

[101] Íd.

[102] Petición de *certiorari*, pág. 14.

de la Ley de Quiebras. No obstante, este Tribunal entiende que la determinación de la Corte de Quiebras no impide la resolución en los méritos del presente caso.[103]

Ahora bien, es menester recordar que AFI, la corporación que se acogió al procedimiento de quiebra, no es una parte en el caso ante nuestra consideración. Como hemos mencionado, los efectos de la paralización automática aplican exclusivamente al deudor que se acoge al procedimiento de quiebra, mas no así a terceros. Por consiguiente, no es correcto en Derecho extender esa paralización a AMGI como pretende la parte peticionaria.

Además, AMGI anejó a su alegato, para conocimiento de este Tribunal, una transcripción y la minuta correspondiente de los procedimientos ocurridos en la acción adversativa instada por AFI en contra de WM Capital, la parte que presuntamente adquirió los pagarés en controversia de la parte peticionaria.[104] De estos documentos surge que la Corte de Quiebras no ha extendido la paralización automática al presente pleito. Por el contrario, lo que hizo fue suspender los asuntos relacionados a la controversia referente a los pagarés hasta tanto esta Curia emita su determinación al respecto.[105] Específicamente, la minuta de la Corte de Quiebras lee: "Debtor's confirmation and its objection to

---

[103] Apéndice de la petición de *certiorari*, pág. 6.

[104] Apéndice del alegato de los recurridos, págs. 94-113.

[105] Alegato de los recurridos, págs. 23-28.

WM's claim no. 2 **are held in abeyance** until the resolution of the adversary case and **until the resolution of the state court action before the Puerto Rico Supreme Court"**. (Énfasis suplido).[106]

Curiosamente, la parte peticionaria incluye en sus anejos documentos del mismo trámite, pero llega a una conclusión distinta.[107] Este aduce que se privó de jurisdicción a los tribunales estatales por virtud del procedimiento de quiebra, sin embargo, incluye entre sus apéndices la minuta que dispone la suspensión de la controversia en cuanto a los pagarés.[108] Incluso, aneja sendas mociones de las partes en ese caso que dejan clara la distinción señalada por AMGI entre la controversia sobre los pagarés y la controversia central de la acción adversativa, el retracto de crédito litigioso:

   3. In this case Debtor has filed adversary proceeding no.: 16-0033 in order to assert the right to purchase the litigious credit for the same amount the credit was purchased by WM Capital from Scotiabank.

   .    .    .    .    .    .    .    .    .

   5. The Debtor also objects the extent of the security claimed by WM. WM is claiming that Claim #2 is fully secured by certain mortgages. Among the mortgages included, WM is asserting a lien over Property #2748 on account of two *mortgage notes* for $800,000.00 and $400,000.00. Nevertheless, the Debtor does not have any interest in this property. The same was sold to a third party, (Allied Management Group) who paid in full these notes to

---

[106] Apéndice del alegato de los recurridos, pág. 112.

[107] Véase, Índice del apéndice del alegato del peticionario.

[108] Apéndice del alegato del peticionario, págs. 219-220.

Debtor's original lender R&G Premier Bank of Puerto
Rico (R&G).

     6. When the FDIC closed R&G and thereafter sold
its assets to Scotiabank, Allied Management
requested the turnover of the **mortgage notes** to
Scotiabank. Scotiabank refused to tender the notes
and **the matter is subject of state court litigation.**
(Énfasis suplido).[109]

     De lo anterior surge claramente que los pagarés en
controversia no son objeto de la acción adversativa.
Primero, porque así lo reconoce la propia Corte de
Quiebras, quien decidió ordenar la suspensión del asunto
hasta tanto se dilucide dicha controversia en los
tribunales estatales, y segundo, porque su titularidad no
es un hecho medular en la acción adversativa. Simplemente
debe adjudicarse la titularidad para determinar si WM
Capital ha presentado colateral suficiente para asegurar
su reclamo, cuestión que se ha encomendado al tribunal
estatal. Más aún, en contestación a la moción citada, WM
Capital responde:

     This controversy is currently being litigated
in the Supreme Court of Puerto Rico and is still
pending resolution between Allied Management and
Scotiabank. […] **Since the issue raised in objection
deals with property that is not part of the estate
and mortgages issued by an entity that is not the
Debtor, and, since these issues are pending before
the Supreme Court, the Court should deny the
Objection, or defer consideration of the same, until
a final judgement is issued on this matter in the
pending local court litigation.** (Énfasis suplido).[110]

     Por todo lo anterior, entendemos que no se ha privado
de jurisdicción a los foros estatales para adjudicar la

---

[109] Íd., págs. 203-205.

[110] Íd., pág. 216.

controversia relacionada a la titularidad de los pagarés. Consecuentemente, no se cometió el error señalado.

En su segundo señalamiento de error, la parte peticionaria sostuvo que WM Capital es parte indispensable en este litigio debido a que es la tenedora actual de los pagarés en controversia.[111] A esos efectos, el Tribunal de Apelaciones resolvió que, aun en el caso de que exista un acuerdo entre WM Capital y la parte peticionaria que haya privado de tenencia al peticionario,[112] no es indispensable la presencia de WM Capital en el litigio, pues la adjudicación final no le privaría de remedio.[113] AMGI tendría disponible una acción de daños contra la parte peticionaria o, en el supuesto de que el peticionario se encontrara imposibilitado de devolver los pagarés, tendría que pagarle el importe del valor de estos.[114] Los argumentos levantados por la parte peticionaria descansan sobre la posibilidad de que el procedimiento de quiebra adjudique la titularidad de los pagarés y de esa manera se prive de derecho a AMGI.[115] No obstante, como ya indicamos, la Corte de Quiebras reconoció que son los tribunales estatales quienes adjudicarán la controversia sobre la titularidad de los pagarés. En ese sentido, carecen de méritos los

---

[111] Petición de *certiorari*, pág. 17.

[112] Apéndice de la petición de *certiorari*, pág. 13: "Debemos señalar que en el expediente no obran documentos que evidencien el referido acuerdo o contrato entre Scotiabank y WM Partners".

[113] Íd., pág. 13.

[114] Íd., págs. 13-14.

[115] Petición de *certiorari*, págs. 16-17.

argumentos presentados por la parte peticionaria. Además, coincidimos con la determinación del Tribunal de Apelaciones sobre las otras acciones disponibles que tendría AMGI si la parte peticionaria tuviera que devolverle los pagarés y fuera incapaz de ello. Por lo tanto, entendemos que el foro apelativo intermedio resolvió correctamente.

Finalmente, la parte peticionaria alegó que el Tribunal de Apelaciones incidió al asumir jurisdicción sobre el caso, a pesar de que no se agotaron los remedios administrativos que dispone FIRREA. A esos fines, debemos determinar si era requisito jurisdiccional que AMGI agotara los remedios administrativos al amparo de FIRREA para ejercer su acción contra la parte peticionaria.

En primer lugar, cabe precisar que AMGI sostuvo en su alegato que no era requisito agotar los remedios administrativos, porque "los actos y omisiones que se reclaman en este pleito no son atribuibles a R-G sino a Scotiabank".[116] Esta posición fue avalada por el Tribunal de Apelaciones al disponer lo siguiente:

> En el presente caso los Peticionarios [AMGI] saldaron la deuda de $1,080,000.00 garantizada con los dos pagarés en disputa en octubre del año 2009. Los Peticionarios solicitaron la devolución de los pagarés en el año 2013, cuando Scotiabank tenía la posesión de estos. Consecuentemente, el incumplimiento con los términos del 'Mortgage Warehouse Credit Agreement' y del 'Term Loan Agreement' ocurrió en el 2013, cuando Scotiabank se negó a devolver los dos pagarés saldos. Ante este escenario, el incumplimiento no es imputable al banco fallido RG ni al FDIC, por lo cual no aplica

---

[116] Alegato de los recurridos, pág. 37.

el procedimiento administrativo provisto por FIRREA. Además, es apropiado señalar que la FIRREA no autoriza el incumplimiento con obligaciones contractuales.[117]

Así las cosas, en el presente caso lo que corresponde es determinar si la acción instada en contra de la parte peticionaria constituye un reclamo al amparo de la sec. 1821(d)(13)(D) de FIRREA, de manera que sea jurisdiccional el requisito de los remedios administrativos.

Aquí la parte peticionaria es una institución depositaria que adquirió los activos de R-G a través del FDIC, facultado para ello por FIRREA. Al tratarse de activos adquiridos por FIRREA, corresponde primero determinar si estamos ante una situación contemplada por el inciso (i) o (ii) de la limitación judicial de FIRREA. Es decir, primero debemos resolver si estamos ante una acción solicitando pago o determinación de derechos sobre los activos, o si, de lo contrario, estamos ante una acción u omisión. Esto, porque si estamos ante una situación bajo el inciso (i), el tribunal estaría vedado por completo para actuar. Sin embargo, si se trata de un escenario enmarcado en el inciso (ii), lo determinante será si las acciones u omisiones fueron por parte de R-G, de la FDIC como síndico, o de la parte peticionaria por sí mismo. Para ello, examinemos las circunstancias particulares que dieron origen a la reclamación en este caso.

---

[117] Apéndice de la petición de *certiorari*, pág. 10.

Primeramente, debemos señalar que la obligación sobre la cual versa este caso es un contrato de prenda suscrito entre R-G y AFI.[118] A través de este, R-G concedió a AFI un adelanto de una línea de crédito y, como garantía de pago, AFI entregó en prenda los pagarés.[119] Conforme alega AMGI, una vez AFI saldara el monto del adelanto se le devolverían los pagarés dados en prenda.[120] No obstante, a pesar de que AMGI pagó el monto correspondiente y, como tercero con interés activó el derecho de subrogación, este nunca solicitó a R-G la devolución de los pagarés.[121] No fue hasta que la parte peticionaria adquiere los pagarés que AMGI peticionó su devolución. Así, ante la negativa de la parte peticionaria surge la presente causa de acción.

A base de lo anterior, podemos colegir que no estamos ante un escenario bajo el inciso (i) de la sec. 1821(d)(13)(D) de FIRREA. Es decir, en este caso no se está solicitando el pago o la determinación de derechos sobre activos de la institución fallida, o sea, de R-G. Este pleito trata sobre un incumplimiento contractual que, a primera vista, podría estar enmarcado en el inciso (ii) sobre las acciones u omisiones del banco fallido o del FDIC. Ahora bien, siguiendo la interpretación que han

---

[118] Íd., págs. 3-4.

[119] Íd., pág. 4.

[120] Íd., págs. 11-12.

[121] Incluso, en su alegato, la parte peticionaria declara que "Allied Management ni Allied Financial exigieron la devolución de los pagarés cuando remitieron la suma de dinero a R-G". Alegato del peticionario, pág. 7.

brindado los circuitos a este inciso, habría que evaluar a quién se atribuye la acción u omisión, si a R-G, al FDIC o a la parte peticionaria. Esto pues, como mencionamos, el referido inciso (ii) solo sería aplicable cuando las acciones u omisiones son atribuibles a la institución fallida o al FDIC.

Al examinar los hechos de este caso, es preciso mencionar que, aun cuando la obligación de R-G de entregar los pagarés hubiese surgido desde que AMGI satisfizo la deuda de AFI, no fue hasta que la parte peticionaria se negó a entregarlos que se entendería violentado definitivamente el contrato de prenda. Ello, pues el pago de AMGI no extinguió el contrato, sino que causó su subrogación en la posición del acreedor. AMGI, como dueño de la propiedad hipotecada a favor de AFI y objeto de los pagarés aquí en controversia, es un tercero con interés cuyo pago de la obligación activó la subrogación. A base de estos hechos, es claro que la acción ocurrió como resultado del incumplimiento de la parte peticionaria con el contrato de prenda. Es decir, el incumplimiento no fue por parte del banco fallido o por la FDIC, sino que fue por el banco sucesor. Por lo tanto, no reunía los requisitos dispuestos en el inciso (ii) y, por consiguiente, no se tenían que agotar los remedios administrativos dispuestos por FIRREA. Así, los tribunales estatales tenían jurisdicción para atender la demanda instada.

Por todo lo anterior, resolvemos que no se cometieron los errores señalados y, por consiguiente, el Tribunal de Apelaciones actuó con jurisdicción al emitir su determinación. Así, se confirma el dictamen recurrido.[122]

## IV

Por los fundamentos que anteceden, se confirma el dictamen del Tribunal de Apelaciones.

Se dictará sentencia de conformidad.

Edgardo Rivera García
Juez Asociado

---

[122] Es preciso señalar que la parte peticionaria no impugnó los méritos de la determinación del Tribunal de Apelaciones ante este Tribunal, entiéndase, el asunto de la titularidad de los pagarés. A esos efectos, este dispuso lo siguiente: "[E]n este recurso no pretendemos que el Honorable Tribunal resuelva qui[é]n es el titular de los pagarés hipotecarios de Isabela. En el caso de epígrafe solo planteamos que el Tribunal de Apelaciones no tenía jurisdicción para adjudicar esa controversia ante los procedimientos seguidos ante la Corte de Quiebras y la ausencia de WM Capital como parte indispensable". Alegato del peticionario, pág. 45.

EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| ALLIED MANAGEMENT GROUP, INC.; RAFAEL PORTELA RODRÍGUEZ<br><br>Recurridos<br><br>v.<br><br>ORIENTAL BANK<br><br>Peticionaria | CC-2016-759 |

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de junio de 2020.

Por los fundamentos expuestos en la Opinión que antecede, los cuales se hacen formar parte de esta Sentencia, se confirma el dictamen del Tribunal de Apelaciones.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo.

La Juez Asociada señora Rodríguez Rodríguez disiente sin opinión escrita.

José Ignacio Campos Pérez
Secretario del Tribunal Supremo